# Pugh *against* Good.

Delivery of possession of land, in pursuance of a parol contract, amounts to part performance, and the vendee, as well as the vendor, may insist on specific execution of the contract.

Therefore if in such case one authorized by the vendor to deliver the possession to the vendee, takes a lease of the land from the vendee, and enters into actual possession, there is an equitable estate in the lessor, which is bound by a judgment against him.

The doctrines of the English chancellors, concerning part performance of parol contracts for land, have been adopted as the law of Pennsylvania, under our Act of Assembly against frauds and perjuries, notwithstanding the omission in the latter of the 4th Section of the English statute.

THIS was an appeal from the decree of the Common Pleas of *Bucks* county, distributing the fund in the sheriff's hands arising from the sale of the defendant's real estate under a writ of *venditioni exponas*, at the suit of John B. Pugh. The facts of the case are as follows: On the 28th of June 1836, Edwin Yerkes executed a deed in fee simple to Chalkley Good, for a lot in Bucks county, designated the *Shop Lot;* and on the 29th of June 1836, Evelina Burson entered a judgment on a bond, with warrant of attorney, in the Common Pleas of Bucks county, against Chalkley Good, for $275. The 1st day of April 1837, Edwin Yerkes executed a deed to Good for another lot in Bucks county, designated the *House Lot;* and on the 5th day of July 1837, J. B. Pugh, the appellant, entered in the Common Pleas of Bucks, a judgment on a bond, with warrant of attorney against Good, for $335. July 17th, 1837, Edwin Yerkes & Co. also entered judgment in the same court against the same defendant, for $389, on a bond, with warrant of attorney dated April 3d, 1837. Both lots were sold under the *venditioni exponas* issued by John B. Pugh to December term 1838. The proceeds of the sale of the *shop lot* were paid to Evelina Burson, on her judgment, leaving a balance due her of about $70; which sum she claimed to be paid out of the proceeds of the sale of the *house lot.* Her right to it was disputed by John B. Pugh, who also claimed it by virtue of his judgment. It was admitted, that if Eve-

[Pugh v. Good.]

lina Burson be entitled to the money claimed by her, there will be no fund to pay Pugh's judgment. A rule was taken by Evelina Burson, in the court below, to show cause why she should not take out of the sheriff's hands the balance due on her judgment. The following depositions were read on the argument of the rule.

*Edwin Yerkes* affirmed that he contracted to sell the *house lot* (now owned by plaintiff), to Chalkley Good, on or about the 1st of April 1835. The contract was a verbal one. The defendant took possession of the said lot at the time of the contract. He was to give me $100 for the lot. I charged him, on the 1st of April 1836, with one year's interest. I rented the lot of him for pasture, at the time of the contract, and allowed him $2.50 for the one year's rent. I made the contract with Chalkley Good, as the agent for my father for the shop lot : the contract for that lot was verbal, and entered into after the contract made for the house lot;—don't remember the exact time.

*Cross-examined.*—I don't recollect which of the two deeds was for plaintiff's lot ; my impression is that the deed made by my father was for the shop lot. I made the contract, for both lots, with Chalkley Good, as the agent of my father. After I sold the lot to Chalkley, he talked of putting it in with potatoes ; but I told him he had better rent it to me, for pasture, as it was not enclosed.

*Chalkley Good.* It was in the year 1835 I contracted with Edwin Yerkes for the purchase of the house lot. I took possession of the lot, and paid interest for the purchase money from the time the bargain was made ; it was a verbal contract. I was to give $100 for it. I gave a judgment bond to Yerkes for $389, which is still unpaid. Yerkes and I had a settlement, and I gave him a judgment for $389. The judgment, I think, was given to the firm of Yerkes & Co. I had an account against Yerkes, after the purchase of the lot. I paid Yerkes money on account, after the purchase of the lot ; I think, upwards of $100. I think the deed I got from Harman Yerkes was for the shop lot. I paid for the shop lot out of the money I got of E. Burson ; but don't know that I paid any of said money for house lot.

After argument, the court directed the rule to be made absolute ; and J. B. Pugh entered this appeal, and assigned for error, that the court erred in directing the rule to be made absolute.

*Ross*, for the appellant.
*Dubois, contra.*

The opinion of the Court was delivered by

GIBSON, C. J.—It requires but a glance at the decisions of this court, to see that we have, from the first, implicitly followed the decisions on the British Statute of Frauds, as guides to the interpretation of what we supposed to be our own. The British Statute, though prior to Mr Penn's charter, seems not to have been considered as extended to Pennsylvania ; and our own Statute

III. — 8

[Pugh v. Good.]

was enacted so late as 1772; yet it may be doubted whether before that time a legal estate of freehold might not have been created here by livery and seisin, or by a parol conveyance. However that may be, we find, in *Thomson* v. *White*, (1 *Dall.* 426), which was determined in 1789, Chief Justice M'Kean copiously quoting the decisions on the British Statute, and declaring, in accordance with their spirit, that as the Act of Assembly, as well as the Statute, was made to prevent frauds equally with perjuries, it should be expounded liberally and beneficially, "for the suppression of cheats and wrongs." "Whether the Courts of Chancery," said Chief Justice Tilghman, in *Ebert* v. *Wood*, (1 *Binn.* 218), "have gone further than they ought, in thus giving efficacy to a parol agreement concerning land, we do not think ourselves at liberty, now, to inquire, because the principles I have mentioned have been adopted by this court, and long considered the law of the land; and to question them now, would shake many titles acquired under their authority." "It is too late," said Mr Justice Yeates, in *Smith* v. *Patton*, (1 *Serg. & Rawle* 84), "to inquire, at this day, into the propriety of our adoption of the British decisions, that agreements, in part executed, are taken out of the Statute of Frauds and Perjuries. Statutes made to prevent frauds, are not designed to protect them. Wanting a Court of Chancery, we have admitted its rules, in certain cases, to prevent an absolute failure of justice, although we differ in the mode of relief. A system has thus grown to maturity, established by repeated decisions, and recognised by the constitution, as the chancery powers usually exercised in the courts of law." Other *dicta* of the sort might be cited; but as the Judges whose sentiments I have quoted were among the foremost of those who laid the foundations of our jurisprudence, I submit that their authority alone ought to restrain us from catching at an accidental difference of enactment, in order to sever our interpretation, in other respects, from that of the British chancellors, on a supposition, whether founded or not, that they went originally too far, especially as our legislature, in following the words of their Statute, as far as the circumstances of our property would permit, must have had in view the benefit to be derived from a settled construction. That the British construction was, in fact, adopted, is shown by the preceding quotations; and, indeed, we cannot open one of our cases on the subject, without being satisfied of the fact, that no difference between part performance under the original Statute, and part performance under our imperfect copy of it, has before been attempted; or without seeing that British precedents, for such a case, have been as freely appealed to as our own. The only apparent exception to this, is found in *Todd* v. *Pfoutz*, (3 *Yeates* 179), in which it was said, that the English cases of specific performance are not strictly applicable to agreements of considerable standing here, where lands are less stationary in value than they are in an old country; but

that was evidently said with a view, not to what constitutes part performance under the Statute of Frauds, but to laches which would induce a chancellor to withhold his assistance from the execution of the contract, independently of it.

But, as regards part performance, what reason was there for a difference of construction originally? Our Statute is a transcript of the first three sections of the British Act; but what is thought to be of importance is, it omits the fourth section, which declares, that " no action shall be brought to charge any person, upon any contract or sale of lands, tenements or hereditaments, or any interest in or concerning them — unless the agreement, on which such action shall be brought, shall be in writing, and signed by the party to be charged therewith, or by some person thereunto by him properly authorized;" and hence it is thought, by some, that there is less occasion for departing from the letter, here, than there is in England, where an action at law for the breach of the contract is prohibited. But was it ever doubted, that if the contract had never been decreed specifically, compensation must necessarily have been given, as an equivalent for it, by the Courts of Equity, to which the letter of the section did not extend? Those who object entirely to the doctrine of specific execution for part performance, do so on the ground that the proper relief would be compensation, in all cases, and nothing else. Such, at least, was the notion of Lord Alvanley, in *Forster* v. *Hale*, (3 *Vez.* 713). Had, therefore, the fourth section of the British Statute been enacted here, compensation must have been attainable in our courts by an equitable action, not indeed " upon the contract," as forbidden by the statute, but collateral to it; and as readily as it could be by a bill in equity, for which we have often made such an action a substitute; for no community could long bear the oppression of an unflinching enforcement of this section. The justice of this remark is put in a strong light, by Mr Justice Huston, in *Clarke* v. *Vankirk*, (14 *Serg. & Rawle* 354). I take it, therefore, that an equitable action to restore the parties to their former condition, would have lain from the necessity of the case.

But what is of infinitely more importance is the undoubted fact that it is exclusively on the prohibitory effect of this same omitted section that resistance to specific execution for part performance has ever been made in the British Courts; on what prohibition it has been made in ours, is nowhere distinctly asserted; but the want of a statute foundation for such resistance, certainly does not add to its force. I know not whether this very material fact has occurred to the profession. I incline to think that no difference of enactment betwixt the British Statute and our own in regard to executory sales of land, has been suspected; yet nothing is more certain than that the whole doctrine of part performance rests on this fourth section in the British Courts, for no other part of their statute makes writing essential to the validity of such

sales.  The first section, indeed, like our own, declares estates created by livery and seisin, or by *parol,* to be of no greater effect in law or in equity than estates at will; but that plainly regards conveyances or contracts executed, and not contracts executory, whose enforcement requires the power of a chancellor.   Mr Roberts, Mr Newland, and perhaps every other writer on the statute, have arranged the cases on the subject of part perform-ance under the fourth section, while the cases of conveyances executed have been arranged by them under the first.   The one annuls a parol agreement for a written conveyance, while the other annuls a parol bargain and sale which had been entirely valid during the interval between the statute of uses and the statute of enrolments, (2 *Inst.* 675), and which, by reason of the customs and privileges of certain boroughs, had not been entirely cut up before the Act in question, (*Roberts on Frauds,* 270).   Nor did any act at the time of our own Statute of Frauds require all conveyances in Pennsylvania to be in writing without exception. But that the fourth section is the one which bears on executory sales of land in England, is shown by *Whitbread* v. *Brockhurst,* (1 *Bro. Ch. Rep.* 416), in which the case was made to turn dis-tinctly on it, and in which Lord Thurlow said, " that though this clause of the statute declares that no *action* shall be sustained on any contract or sale of land unless the agreement shall be in writing, and attended with the forms therein required, yet that the court had *adopted* the provisions of the statute so far as to permit it to be pleaded to bills for the performance of agree-ments." (*S. P.* 1 *Powel on Contr.* 270.)   No English lawyer would have thought of putting such a case on any other founda-tion; and had it not been for the existence of that section, we should never have heard of an objection to the specific enforce-ment of a sale of land, merely because the agreement rested in parol.   Yet I would not have it thought for an instant that such an agreement must necessarily be enforced here in all cases, or that it does not stand on the same footing by force of our deci-sions, as it does in England by force of the statute.   I would account for the existence of the doctrine here as we account for that provision of the 3 and 4 Anne, which gives the drawee of a promissory note an action on it, though the other parts of that statute have been supplied by an Act of our own; and like that provision, I would hold the particular clause in the fourth section of the British Statute of Frauds to have been extended here by adoption, had not this court, very inconsistently I think, held it otherwise in *Bell* v. *Andrews,* (4 *Dall.* 152.)   As it is, we must take that clause with its equitable exceptions to be part of our peculiar common law adopted in analogy to the British Statute, as we take the doctrine of charitable uses to be adopted in analogy to the statute of that name; or if it must necessarily have a statute foundation, we must forcibly engraft it on that clause of

our Act which limits the effect of a parol conveyance to the creation of an estate at will, though there be great difficulty in doing this: for though the words are that such an estate shall have no greater effect "in law or *equity*," the purpose was not to prevent chancery from adding the legal title to an equitable estate; for the Legislature were dealing, not with an agreement, but with what was already a legal title. Beside, if the purpose had been to prohibit a parol agreement, it would have been equally attained by declaring it invalid at law, as was done by the fourth section of the British Statute; and the addition of the words "in equity," seems to be one of those redundancies which are common in the language of legislation. But whether we take the doctrine of part performance to be an emanation from the interpretation of the omitted British section, or an exception to the letter of our own; it is certain that no positive injunction is more unnecessarily violated by it here than it is in England. Indeed, the difficulty with us is not so much to avoid such a violation, as to discover any rule of positive enactment which might be the subject of it; and our courts ought not, therefore, on that account, to feel themselves the more trammelled in the administration of equitable relief.

Now though it was held by this court in the case of *Allen's Estate*, (1 *Watts & Serg.* 383), that delivering possession of a portion of the land, is not part performance, and though it seems to have been conceded there that delivery of the whole would be so, yet the point has not till now come before this court directly for adjudication. Considering the question then to be an open one as respects our own decisions, it is a concession to those who doubt the propriety of specific performance in every case, to put it on the basis of the fourth section of the British statute, but for which, a parol contract of sale might be enforced, whether it were partly executed or not. But the authorities make short work with the question even on that ground. It would be a waste of time at the end of 150 years from the first enactment, to pass the cases in review in order to arrive at its interpretation, when their results have been so carefully collected by the text writers. Now that delivery of possession alone is part performance, has been affirmed in 1 *Pow. on Contr.* 299; *Newland on Contr.* 181; *Sugd. on Vend.* 105; 1 *Fonb.* 175; 1 *Mad. Ch.* 303; *Roberts on Frauds* 147; 4 *Kent* 451; and 2 *Story's Eq. Jurisp.*, ch. 18, § 761. "Whether possession be an unequivocal act amounting to part performance," said Lord Manners in *Kine* v. *Balfe*, (2 *Ball & Beatty* 174), "must depend on the transaction itself. If it be distinctly referred to the contract alleged in the pleadings, I think no case has denied that it is part performance: the defendant is protected from liability as a trespasser, and the plaintiff is disabled from dealing with any other person." After the concurrent opinions of such men, brought down, as in the last case, to a recent period, it

[Pugh v. Good.]

would be presumptuous in me to defend the cases on original grounds; but it is proper to remark, that one of the arguments against making possession part performance, is weakened here, instead of being strengthened by the absence of the omitted section; for if it be necessary in England to break through the statute in order to prevent the vendee from being made a trespasser, how much more readily may parol evidence be admitted here, where there is no express prohibition of the contract in those sections of the statute which we have adopted. Certainly nothing is said in them about a written memorandum of the bargain signed by the party to be charged; the want of which has been the obstacle to specific performance in the English cases; and if the contract may be proved by parol to found an action for damages on it, why may it not be proved by parol to found a decree of specific execution on it? It was because the British statute forbade the courts of law to sustain an action on it, that the Court of Chancery thought the remedy by bill for performance within the equity of the prohibition; and where there is no express prohibition for the one purpose, there can be no implied prohibition for the other. But this is returning to ground already explored. Sir William Grant, however, seems, in *Buckmaster* v. *Harrop*, (7 *Vez.* 431), to have rejected the argument drawn from the protection of the vendee, and to have considered that the application must come from him by whom the agreement has been partly performed; but *Whaley* v. *Bagenel*, (6 *Bro. P. C.* 45), on which he relied, does not bear him out; for though the bill which was dismissed in that case was by him who had not done the acts, they were evidently preparatory to the formation of the contract, and not done in part performance of it: so that the result must have been the same had the application come from the other side. Beside, it is not easy to see how a vendee who has taken possession on the faith of the vendor, is not as much defrauded by being turned out in winter or subjected to mesne profits and the costs of an ejectment in case of resistance, as he who delivered it would be by a recision of the contract; and it is still more difficult to see, upon the all-pervading principle of mutuality which governs a chancellor wherever he is left at liberty to act on principles of general equity, why the contract would be executed in behalf of the one party, if it would not be executed in behalf of the other. Such is the principle of *Bromley* v. *Jefferies*, (2 *Vern.* 415), in which equity refused to execute a covenant by a daughter's father that her husband should have his estate for £1500 less than any other person would be willing to give for it, because the husband was not bound to take it at any price; and for a similar reason it was held in *Flight* v. *Bolland*, (4 *Russel's R.* 298), that a suit for specific performance cannot be maintained by an infant. So a son's bill to enforce a covenant by his father who was tenant for life, was dismissed in *Armiger* v. *Clarke*, (*Bunb.* 111), because the son himself was not

[Pugh v. Good.]

bound. The only exception to the principle is one which has been made by the positive words of the omitted section of the statute under consideration, which declares it to be sufficient in the case of a written agreement that it be signed by the party to be charged; but the consequent dispensation with the principle of mutuality, though perhaps unavoidable, was censured by Lord Redesdale in *Lawrenson* v. *Butler*, (1 *Sch. & Lef.* 13), as an unnecessary departure from the general principle. Such a case, however, is an exception which proves the rule, and furnishes no precedent for a case in which the agreement is not pretended to be in writing or signed by any one, and which the words of the statute do not embrace. The distinction attempted by Sir William Grant, therefore, is groundless; and the vendee as well as the vendor may insist on a specific execution of the contract for part performance by delivery of possession alone.

As a criterion, no objection can be made to it which may not as plausibly be made to possession with payment of purchase money or expenditure in improvements superadded. Though the possession be shown to have been given in reference to some existing contract, it is true that the terms of the bargain must still be proved by parol; and hence the fears of perjury which were entertained by the framers of the statute. But would not the same necessity for parol proof of terms, and the same danger of perjury exist, if the purchase money were paid or improvements were made? If loss of possession may be compensated, so may expenditure, the difference being only in the degree; and it is conceded on all hands that it is proper to go beyond compensation wherever a recision of the contract would be a fraud. Now it is absolutely necessary to establish some definite measure of part performance, or abandon the remedy by specific execution altogether; for there would be neither stability of decision nor security of title without it; and nothing seems so well adapted to the end, or so little susceptible of perjury, as the notorious and unequivocal act of parting with the possession.

We therefore see no obstacle in the way of falling in with the current of the English decisions, by holding delivery of possession pursuant to the contract to be the test of part performance; and what remains to be done, is to apply it to the circumstances of our case. The vendee did not himself take actual possession; but it was shortly afterwards taken by one to whom he had leased the premises, and who had been the agent of the vendor to deliver the possession to the vendee. Having performed his office in the first place, he was at liberty to become the vendee's tenant in his own right; and as his possession was that of his lessor, there was an equitable estate in the latter which was bound by the subsequent judgments. The money in court, therefore, was properly awarded to Evelina Burson, the senior judgment creditor.

Decree affirmed.