### HITE & RAFETTO v. SAVANNAH ELECTRIC CO.

(Circuit Court of Appeals, Fifth Circuit. November 17, 1908.)

No. 1,798.

SALES (§ 22*)—REQUISITES AND VALIDITY—PROPOSAL AND ACCEPTANCE—ACCEPTANCE VARYING FROM OFFER.

> Defendants made a written proposal to furnish a quantity of coal to plaintiff which clearly embodied the terms of the proposed contract. Such proposal was verbally accepted by plaintiff's agent, and it was agreed that he should prepare a formal written contract to be signed by the parties. This he did, and submitted the same to defendants on the next day, but it contained provisions materially varying from those of the proposal and more favorable to plaintiff, and defendants refused to sign it and withdraw their offer. *Held*, in an action by plaintiff to recover damages for breach of the contract made by the verbal acceptance of the original offer, that in proposing a contract materially variant from such offer it virtually took the position that its acceptance thereof was not unconditional and binding upon it, and could not therefore insist that it was binding on defendants, who were at liberty to also treat the negotiations as still open and withdraw their offer.
>
> [Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 39–43; Dec. Dig. § 22.*]

In Error to the Circuit Court of the United States for the Southern District of Georgia.

This is an action for damages for the breach of a contract brought by the Savannah Electric Company against Hite & Rafetto. On September 18, 1905, Hite & Rafetto, through their agents, the Dixon Lumber Company and G. R. Gabell, made proposals to the Savannah Electric Company for supplying it with 12,000 tons of coal. Two propositions in writing were submitted by Hite & Rafetto through their agents; one related to "Peerless Georges Creek coal"; the other related to "Monarch Georges Creek coal." Both propositions were similar, with the exception that the price of the Peerless coal was $3.30 per ton and the price of the Monarch coal was $3.20 per ton, a difference of 10¢ per ton. The Peerless proposition was definitely rejected. After some negotiations, Nash, who was the manager of the Savannah Electric Company and the person with whom the negotiations were conducted, on behalf of that company, stated verbally that he would accept the Monarch proposition, which is as follows:

"Savannah, Ga., Sept. 18th, 1905.

"Savannah Electric Co., Savannah, Ga.

"Gentlemen: We beg to submit the following proposition for supplying you with fuel:

"Coal:

"Monarch, Georges Creek, mined on the Baltimore & Ohio Railroad, near Johnstown, Penna. This coal runs low in volatile matter, approximately 16

---

per cent. to 17 per cent., about 1 per cent. in sulphur, and about 6 per cent. to 7 per cent. in ash.

"Quantity and Supply:

"Twelve thousand tons. Deliveries to commence as soon as practicable and be made so as not to exceed maximum storage capacity of 3,000 tons.

"Supply to be Guaranteed:

"If at any time we are unable to ship coal from Baltimore, Md., or Philadelphia. Pa., account condition of the harbors, we reserve the right to ship a good grade of steam coal from Norfolk or Newport News while the above condition exists.

"Price:

"$3.20 per gross ton of 2240 pounds, delivered your wharf, Savannah.

"Settlements:

"Settlement to be made thirty days from date of bill of lading. Bill of lading weights to govern settlement.

"Quality and Analysis:

"The coal to be of satisfactory quality. In case any cargo or cargoes should cause complaint, we or our representative to be notified, samples taken and analysis made. The price of such cargo or cargoes to be adjusted as per method attached, which would then be considered a part of our contract.

"Certificate of Origin:

"If at any time during the life of the contract you desire substantiating evidence that the coal loaded is what we agree to ship we are prepared to secure from the railroad company certificate sworn to before a notary public, confirming the contents of such cargo.

"Very truly yours,      The Dixon Lumber Company,

"Jas. M. Dixon, Sec'y & Treas.

"Agents for Hite & Rafetto,

"By G. R. Gabell."

Attached to the foregoing was the following paper:

"Savannah Electric Company's Contract.

"The coal shall have approximately the following composition:

| | |
|---|---|
| Moisture | 1.00% |
| Volatile Carbon | 20.00% |
| Ash | 7.00% |
| Sulphur | 1.00% |

"Premiums and Fines:

"Coal exceeding 1% moisture, excess deducted from bill. Coal having less than 1% moisture, deficit added to bill.

"Coal exceeding 20.00% volatile carbon, excess percentage multiplied by two and deducted from bill. Coal having less than 20.00% volatile carbon, deficit percentage multiplied by one and added to bill.

"Coal exceeding 7% in ash, excess percentage multiplied by three and deducted from bill. Deficit, under 7%, multiplied by one and a half and added to bill.

"Addition and Deductions:

"The additions will not go to increase the contract price of the coal, but only to offset any deductions which may be determined by an analysis:

"Method of Sampling:

"A sample to be taken from every tenth bucket (or each, if desired). The pile of coal obtained to be thoroughly mixed and quartered. Two quarters to be thrown out and the remaining two to be mixed and quartered. This process to be repeated until the pile of coal remaining is small enough to be placed in two quart preserve jars. These jars to be sealed and labeled, and one sent to the chemist for analysis and the other retained by the consumers for our use, if desired. Our representative to be notified and sampling taken in his presence, if desired."

164 F.—60

In answer to the question, "What, if anything, was said about drawing up a formal paper?" Nash testified:

"I told Messrs. Dixon and Gabell I would be glad to have the whole thing signed by both parties and before he left, if possible, and, inasmuch as the proposition was submitted in letter form, as there was only one copy of it, it should be redrawn, with several copies, so each of the three parties who were interested could have one, and I would undertake to do that, if possible, before he left town, and just draw the conditions as agreed upon and as shown by that proposition, which was accepted in legal form, so that all could sign it and each have a copy."

Nash undertook to prepare the formal contract. The writing prepared by him is as follows:

"State of Georgia, Chatham County.

"Memorandum of an agreement made and entered into this 19th day of September, 1905, between Hite & Rafetto, a co-partnership, with principal office in the city of Philadelphia, Pa., party of the first part, and the Savannah Electric Company, a corporation·under the laws of said state and county, party of the second part.

"Witnesseth: Whereas the party of the first part desires to furnish and the party of the second part to purchase a supply of coal sufficient for the operation of the power stations of the party of the second part for approximately one year.

"Now, therefore, the parties hereto have agreed together as follows:

"First. The party of the first part agrees to furnish coal in accordance with the following details:

"Brand.—Coal to be furnished is known as the 'Monarch'· Georges Creek coal, mined on the Baltimore and Ohio Railroad, near Johnstown, Pa.

"Quantity and Supply.—This contract covers twelve thousand (12,000) gross tons, delivery of which shall commence in November, and continue at such intervals as will insure continuous supply without exceeding the maximum storage capacity, which is three thousand (3,000) tons, and as far as practicable not to exceed the normal storage capacity of twenty-five hundred (2,500) tons.

"The party of the first part guarantees to keep the party of the second part continuously supplied with coal during the life of this contract. If at any time it is impossible to ship coal from Baltimore, Md., or Philadelphia, Pa., on account of frozen condition of the harbors, it is agreed that shipment may be made from Norfolk, Newport News, of a similar grade of steam coal while such condition exists.

"Quality and Analysis.—The coal is to be of satisfactory quality, equal to standard Georges Creek, and shall have the following approximate analysis: Moisture 1 per cent., volatile matter 16 per cent. to 17 per cent., ash 6 per cent. to 7 per cent., fixed carbon 75 per cent. to 77 per cent., sulphur 1 per cent. In case any cargo or cargoes shall give unsatisfactory results, the party of the first part or their representatives shall be notified, and samples shall be taken and forwarded to some reputable chemist by whom an analysis shall be made at the expense of the party of the first part, on the basis of which the price shall be adjusted.

"Certificate of Weight and Origin.—The party of the first part agrees to furnish for each cargo of coal shipped a sworn certificate of the railroad company of the weight and original shipping point of the coal.

"Second. In consideration of the above, the party of the second part agrees to pay to the party of the first part for the coal described three dollars and twenty cents ($3.20) per gross ton 2240 pounds discharged at its wharf in Savannah, stevedores to be selected by the party of the second part. All bills shall be paid within thirty (30) days from date of bill of lading, if deliveries have been made. Bill of lading weights shall govern settlements.

"Third. Should the party of the second part find cause for complaint, of the quality of any particular cargo or cargoes of coal, the price of the coal shall

be corrected for such unsatisfactory quality in accordance with the following method—a standard analysis is assumed, namely:

"Moisture 1 per cent.
"Volatile matter 20 per cent.
"Ash 7 per cent.
"Fixed carbon 72 per cent.
"Sulphur 1 per cent.

"Should the analysis of the coal from any cargo show moisture exceeding 1 per cent. the excess over 1 per cent. in per cent. shall be deducted from the contract price of the coal. Should the moisture be less than 1 per cent. the deficit in per cent. shall be added to the contract price of the coal. Should the coal contain more than 20 per cent. volatile matter, the excess over 20 per cent. shall be multiplied by two and deducted from the contract price. Should the volatile matter be less than 20 per cent. the deficit percentage shall be multiplied by one and added to the contract price. Should the ash, as shown by the analysis, exceed 7 per cent. the excess in percentage shall be multiplied by three and deducted from the contract price; should the ash be less than 7 per cent. the deficit under 7 per cent. shall be multiplied by one and a half and added to the contract price.

"It is understood between the parties that the additions above referred to shall not go to increase the contract price of the coal, but only to offset any deductions which may be determined by the analysis.

"Method of Sampling.—A sample shall be taken from every tenth bucket by the party of the second part in the presence of a representative of the party of the first part. The pile of coal thus obtained shall be thoroughly mixed and quartered, the two opposite quarters thrown away and the two others mixed and again quartered; this process to be continued until the two remaining quarters, which shall also be mixed, will fill two one-quart preserve jars. These jars shall be sealed and labeled, one sent by the party of the second part to the chemist for analysis and the other retained by said party for further reference. The report of the chemist shall be final and binding upon both parties as the basis of settlement, unless otherwise agreed upon.

"Alternative Coal.—The party of the second part may, at any time during the life of this contract, order the party of the first part to substitute for a cargo or cargoes, or for the entire balance of the contract, the so-called 'Peerless' Georges Creek coal, which is now being furnished under a contract for 12,000 tons entered into in September, 1904, between the parties. The party of the first part agrees to furnish this coal at a price ten (10) cents greater per gross ton than that named in the contract for the Monarch coal. In all other respects the terms of this contract shall apply.

"In witness whereof the parties hereto have hereunto set their hands and seals the day and year first above written. ————— —————,

"By ————————.

"Executed in the presence of:        "Savannah Electric Co.,
   "Manning White.                    "By L. R. Nash, Mgr.
"As to execution by the Savannah Electric Co."

This formal agreement was signed by the Savannah Electric Company. On September 19th, a copy was sent to the Dixon Lumber Company, and on September 21st a copy was sent to Hite & Rafetto. On October 14, 1905, Hite & Rafetto, in a letter to Nash, manager of the Savannah Electric Company, formally withdrew their original proposition in the following letter:

"Owing to the absence of our Mr. Rafetto in the West for the past two weeks, and our inability to see Mr. Hite, we have not been able to take up the question of form of contract which you sent us under date of September 19th. The form of contract which you sent us differs materially with the proposition as submitted by us under date of September 18th, and we cannot accept it, and, therefore, return it to you and withdraw our proposition. If, however, you desire to negotiate with us further in regard to your coal supply for the following year, we shall be glad to take it up with you, and await your farther advices."

The several points of difference between the proposal of September 18th, which was accepted and which is the basis of this action, and the formal contract prepared by Nash, is shown by the following parallel columns:

Proposal of September 18, 1905.

1. The coal to be of satisfactory quality. This coal runs low in volatile matter, approximately 16% to 17%, about 1% in sulphur and about 6% to 7% in ash. Specification attached to letter.

2. Deliveries to commence as soon as practicable, and be made so as not to exceed maximum storage capacity of 3,000 tons.

3. If at any time we are unable to ship coal from Baltimore, Md., or Philadelphia, Pa., account condition of the harbors, we reserve the right to ship good grade of steam coal from Norfolk or Newport News, while the above condition exists.

4. Price: $3.20 per gross ton of 2240 lbs., delivered your wharf, Savannah.

5. Settlements to be made thirty days from date of bill of lading.

6. If at any time during the life of the contract, you desire substantiating evidence that the coal loaded is what we agree to ship, we are prepared to secure from the railroad company certificate sworn to before a notary public, confirming the contents of such cargo.

7. In case any cargo or cargoes shall cause complaint, we or our representative to be notified, samples taken and analysis made. The price of such cargo or cargoes to be adjusted as per method attached, which would then be considered as part of our contract.

8. (Nothing in proposal on this subject.)

9. (Nothing in proposal on this subject.)

Form of Contract Prepared by Nash.

The coal is to be of satisfactory quality equal to Standard Georges Creek, and shall have the following approximate analysis: Moisture 1%, volatile matter 16% to 17%, ash 6% to 7%, fixed carbon 75% to 77%, sulphur 1%.

Delivery of which shall commence in November and continue at such intervals as will insure continuous supply without exceeding the maximum storage capacity, which is 3,000 tons, and as far as practicable not to exceed the normal storage capacity of 2,500 tons.

If at any time it is impossible to ship coal from Baltimore, Md., or Philadelphia, Pa., on account of frozen condition of harbors, it is agreed that shipment may be made from Norfolk, Newport News, of a similar grade of steam coal while such condition exists.

$3.20 per gross ton 2240 lbs. discharged at its wharf in Savannah, stevedores to be selected by party of second part.

All bills shall be paid within thirty days from date of bill of lading, if deliveries have been made.

Certificates of Weights and Origin. The party of the first part agrees to furnish for each cargo of coal shipped a sworn certificate of the railroad company of the weight and original shipping point of the coal.

In case any cargo or cargoes shall give unsatisfactory results, the party of the first part or their representative shall be notified, and samples shall be taken and forwarded to some reputable chemist, by whom an analysis shall be made at the expense of the party of the first part, on the basis of which the price shall be adjusted.

The report of the chemist shall be final and binding upon both parties, as the basis of settlement, unless otherwise agreed upon.

Alternative Coal. The party of the second part may at any time during the life of this contract order the party of the first part to substitute for a cargo or cargoes, or for the entire balance of the contract, the so-called

"Peerless" Georges Creek coal, which is now being furnished under a contract for 12,000 tons, entered into September, 1904, between the parties. The party of the first part agrees to furnish this coal at a price 10 cents greater per gross ton than that named in this contract for the Monarch coal. In all other respects the terms of this contract shall apply.

The last clause of the formal contract, which is headed "Alternative Coal," provides that the Savannah Electric Company should have the option to use the Peerless Georges Creek coal instead of the Monarch Georges Creek coal at a price 10 cents greater per ton than the contract price for the Monarch coal. The plaintiff offered to prove by Nash that Gabell had verbally suggested to him that, if they wanted to use Peerless coal as alternative coal under the contract, they might do so at 10 cents advance in price. The court rejected this evidence on the ground that the contract could not be varied by oral evidence. Evidence was offered by Hite & Rafetto to show that there was a substantial difference in price and quality between "Peerless" coal and "Monarch" coal.

The defendants requested the court to direct a verdict for them, because, under the evidence, there was no contract between the parties; the offer of the defendant was not unconditionally and finally accepted and assented to by the plaintiff; but, on the contrary, the plaintiff prepared and sent to the defendants a written contract, already signed by itself, and to be signed by the defendants, which contained materially different terms and conditions from those of the defendants' offer, and the defendants thereupon withdrew their offer. The refusal to so direct the jury is assigned as error.

T. M. Cunningham, Jr. (Lawton & Cunningham, of counsel), for plaintiffs in error.

William W. Osborne and Alexander A. Lawrence, for defendant in error.

Before PARDEE and SHELBY, Circuit Judges, and BURNS, District Judge.

SHELBY, Circuit Judge (after stating the facts as above). The written offer of Hite & Rafetto, dated September 18, 1905, to sell the Monarch coal to the Savannah Electric Company, was accepted by the company. The terms of the contract were clearly shown by the written offer and the verbal acceptance. The sellers failing to furnish the coal as offered, the buyer bought elsewhere at an advanced price, and this action is to recover the difference between the agreed price and the price paid. The difference was $10,748.67, for which verdict and judgment were given. It is true that the written offer and the acceptance, if nothing more had occurred, would have made a valid contract. The case turns on occurrences which followed.

It was agreed that the contract should be drafted in a more formal manner, and that several copies should be made, and that it should be signed by the parties to it. Mr. Nash, the agent of the buyer, it was agreed, was to rewrite the contract. It does not appear from the evidence admitted on the trial that Nash was authorized to make material alterations in the terms of the contract. On September 19, 1905, the day after the acceptance of the offer, Nash, having prepared the formal contract, sent it to the Dixon Lumber Company, and on Septem-

ber 21, 1905, a copy was sent to the sellers, Hite & Rafetto, at Baltimore, Md. The formal contract, as prepared by Nash, differed materially from the offer of September 18th. The several material variations are fully shown in the preceding statement of the case. The departures were to the advantage of the buyer, for whom Nash was the agent, and to the detriment of the sellers. On October 14, 1905, the sellers wrote to the buyer, declining to accept the contract prepared by Nash, saying:

"The form of contract which you sent us differs materially from the proposition as submitted by us under date of September 18th, and we cannot accept it, and, therefore, return it to you and withdraw our proposition."

The case depends on the question as to whether or not the sellers, on the facts, had the right to withdraw their proposition; or, to state the question differently, whether or not, on the facts, a contract of sale was made, which remains in force, by the offer and acceptance of September 18th.

A common method of entering into a contract is for one person to make an offer to another, and, if the latter accepts it, the contract is perfected. When a contract is claimed to have been made by correspondence, and not in a writing formally signed, the whole of what passes between the parties must be considered. Applying this rule, it has been held by the House of Lords that, though the first two letters of a correspondence seemed to constitute a complete contract, the court might consider subsequent letters and conversations, and reach the conclusion that no complete contract was established. Hussey v. Horne-Payne, 4 App. Cas. 311. Where the parties orally, or otherwise, agree upon the terms of a contract, and there is final assent to it, the further agreement or intention to reduce it to a formal writing at a subsequent time does not, of itself, show that the contract is not to be binding unless formally reduced to writing and signed. Hodges v. Sublett, 91 Ala. 588, 8 South. 800. Of course, when it appears, notwithstanding the meeting of the minds in verbal or other negotiations, that neither party is to be bound until a formal written contract is made and signed, in such case no contract would be in force until the formal writing was made and signed. Fredericks v. Fasnacht, 30 La. Ann. 117. The fact that it was agreed that Nash was to reduce the offer and acceptance to a formal writing, to be signed by the parties, did not suspend or rescind the contract, if one was made by the offer and acceptance. If he had prepared a contract precisely in the terms of the written offer which he had before him, or if he had prepared one without material variance from the offer, and the seller had refused to accept it, the original offer and acceptance would not have been affected. The agreement to have the more formal writing, it has been held, could be looked to as evidence tending to show that the parties did not intend to bind themselves till the negotiations had been reduced to form. Ridgway v. Wharton, 6 H. L. Cas. 238; Wharton v. Stoutenburgh, 35 N. J. Eq. 266. But, in the case at bar, there seems to have been sufficient reason for making a formal writing and several copies, and it could not be reasonably inferred that any agreement that had been made was to be in abeyance till the for-

mal writing was signed. In Sanders v. Pottlitzer Bros. Fruit Co., 144 N. Y. 209, 39 N. E. 75, 29 L. R. A. 431, 43 Am. St. Rep. 757, it was held, by a divided court, that letters and telegrams which constitute an offer and acceptance of a proposition complete in its terms may constitute a binding contract, although there is an understanding that the agreement shall be expressed in a formal writing, and one of the parties afterwards refuses to sign such an agreement without material modifications. In that case, it appears from the statement in the opinion that the "plaintiffs did prepare and send on the contract precisely in the terms embraced in the foregoing correspondence." The defendant was not satisfied with this, and returned it to the plaintiff. The court held the contract made by the previous correspondence binding.

When Nash was authorized to reduce the offer and acceptance to a formal writing to be signed by the parties, it was, of course, incumbent on him to do it fairly and in good faith. He had the written proposition of sale to guide him. Immaterial variations would have been of no consequence. But, as we have seen, Nash prepared and presented a contract differing in several material points from the offer submitted to the buyer, and these differences were of a kind which were to the disadvantage of the sellers. The formal contract which he prepared is certainly not the proposition and acceptance of September 18th. If we assume that the offer and acceptance is, prima facie, evidence of a contract, it is, of course, the contract embraced by the written offer and no other. What is to be inferred by the preparation and presentation by Nash of the formal writing differing in terms from the offer accepted? If he was acting in good faith, the writing prepared by him must be his interpretation and construction of the offer to sell which had been accepted, and if that be true, with the written offer before us, we would be forced to conclude that there was nothing to show that the sellers had made the agreement as construed by Nash. This would lead to the conclusion that the minds of the contracting parties had not met, and that, although the offer and its acceptance was apparently a completed contract, the subsequent occurrences showed that, in fact, there had not been an agreement. But if the offer and its acceptance did, as matter of law, make a contract, it should not be held, and we do not hold, that the subsequent action of the buyer rescinded or canceled it. This plainly could not be done against the wishes of the sellers. Such action could not do more than extend to the sellers the opportunity to withdraw their offer.

If, on the other hand, we infer that the offer was so plain that Nash must have understood its terms, and that the formal writing prepared by him does not present his construction of the offer, but that it is a counter proposition made by him, or an effort to obtain better terms than those embraced in the offer, what then should follow? If the offer and its acceptance was not binding on the buyer, it was not binding on the sellers; for it is axiomatic that, unless both are bound, neither will be bound. Bishop on Contracts, § 78. If the buyer was free to propose new terms, the sellers were free to decline them. In suggesting new terms, the buyer, in effect, said that the offer and ac-

ceptance was not final. If not final as to the buyer, it could not be conclusive as to the sellers, and they were free to withdraw from the negotiations. Bristol, etc., Co. v. Maggs, 44 Ch. Div. L. R. 618; Johnson v. Latimer, 71 Ga. 470. See, also, Bellamy v. Debenham, 45 Ch. Div. L. R. 481; s. c., on appeal, 1 Ch. Div. (1891) L. R. 412. The buyer should not be permitted to treat the negotiations as open for the purpose of seeking better terms, and, at the same time, hold them closed so as to bind the sellers if they fail to accept the proposed changes. When it proposes a contract materially variant from the offer, it takes the position that the acceptance of the offer was not unconditional and conclusive. The contract for the breach of which this suit is brought is the offer to sell and the acceptance of the offer. If they stood alone, as we have said, they would contain apparently all the elements of a contract. It seems to us that we cannot be required to stop at the acceptance and refuse to consider what followed. Nash immediately proceeded to prepare the formal writing. It was ready for signing on the next day. If it could have been finished instantly when the offer was accepted, and if Nash could have handed the sellers his draft of the formal contract at the moment of acceptance, the acts all taken together would have meant an acceptance of the offer, with the understanding that it be construed to mean what Nash proposed in the new writing. Clearly, the first offer would not bind the buyer until it was unconditionally accepted, and the new writing would not bind the sellers, it containing new terms, until they agreed to it. Crossley v. Maycock, 18 Eq. Cas. 180.

If the sellers, after they received the writing prepared by Nash, had shipped the coal, it would have been uncertain whether they acted on their proposal and its acceptance, or on their consent to the terms of the new instrument. Something remained for them to do to make the situation certain. They must accept the new agreement, or reject it and stand by the first offer and acceptance, or there is uncertainty. The buyer, by tendering a different agreement, had shown that it did not wish to be bound by the first, and it is reasonable and just that this made the sellers free to consent that the buyer should not be bound, thereby obtaining their own release by merely agreeing with the buyer that the first proposal and its acceptance was not final and binding. It would encourage sharp practice and unfair dealing to hold that the buyer could, under pretense of reducing the agreement to a more formal writing, tender a contract much more onerous on the sellers and take the chances of getting it signed, and at the same time keep in force the original agreement with which it was content if it failed to get the better bargain. The buyer should not be allowed to say by its acts that the agreement is not binding as to it, but is conclusive as to the sellers. If it was open to the buyer to disregard its acceptance and to make a new offer, it was open to the sellers to withdraw the one they had made.

The judgment of the Circuit Court is reversed, and the case remanded for a new trial.