NORTHWESTERN LUMBER CO. v. GRAYS HARBOR &
P. S. RY. CO. et al.

(District Court, W. D. Washington, S. D.   November 6, 1913.)

No. 1,866–C.

1. SPECIFIC PERFORMANCE (§ 99*)—DEFAULT OF COMPLAINANT—EFFECT.

Complainant and defendants' predecessor having agreed to a proposition for the sale of certain land to the latter for railroad purposes, a written contract pending the delivery of deeds was demanded; but its terms could not be agreed on because complainant insisted on a provision for a common user bridge which was not in the original negotiations and to which defendants' predecessor would not agree. Complainant demanded a return of the unexecuted draft of the proposed written contract, which was done, and thereafter, when the railroad company de-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

manded deeds to the property in accordance with the original agreement, complainant refused to perform except on payment of $10,000 additional, as it claimed for interest on the original consideration during the delay, which defendants' predecessor declined to pay. *Held*, that such demand was a breach of the agreement by complainant barring its right to specific performance.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 299–304; Dec. Dig. § 99.*]

2. EVIDENCE (§ 461*)—PAROL EVIDENCE—WRITTEN CONTRACT.

Where a contract for the sale of certain real property for railroad purposes provided that complainant vendor should co-operate with the vendee in procuring other properties in H. and also franchises there, parol evidence, though admissible to show that franchises in a particular place were contemplated, was not admissible to prove that such provision was intended to require the railroad company and the city to construct a joint user bridge, provided the city contributed its share of the cost of construction and maintenance.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2129–2133; Dec. Dig. § 461.*]

3. VENDOR AND PURCHASER (§ 16*)—OFFER AND ACCEPTANCE.

Where an acceptance of an offer for the sale of land for railroad purposes required the vendor to co-operate in procuring franchises in H. for the railroad company, a provision, in the proposed contract subsequently tendered for execution, that the vendor would co-operate in procuring such franchises in H., and also in procuring such additional rights of way in the city as the railroad company might desire, was not objectionable as substantially broadening the terms of the acceptance.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 17, 20; Dec. Dig. § 16.*]

4. VENDOR AND PURCHASER (§ 16*)—CONTRACT—EXECUTION.

Where a contract for the sale of certain real property for railroad purposes was prepared and submitted to complainant's president in accordance with previous correspondence between the parties, and he redrafted the contract to include an additional provision for a joint user bridge to which the railroad company would not agree, and he was unwilling to sign any other contract not containing such clause, it sufficiently appeared that complainant refused to execute the contract in accordance with such correspondence.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 17, 20; Dec. Dig. § 16.*]

5. VENDOR AND PURCHASER (§ 42*)—FORMAL CONTRACT—WAIVER.

Where an acceptance of a proposition for the sale of land for railroad purposes called for the execution of a formal contract, but, the parties being unable to agree on the elimination of a clause therefrom providing for a joint user bridge, complainant requested the return of the unexecuted contract, and the railroad company complied with such request, but stated that in returning the same they had no intention of waiving their rights with reference to the agreement to purchase the property, they did not waive the provision in the acceptance requiring the execution of a formal contract.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 68; Dec. Dig. § 42.*]

6. VENDOR AND PURCHASER (§ 42*)—CONTRACT OF SALE—EXECUTION—WAIVER.

Where a railroad company's acceptance of a proposition to sell certain land for railroad purposes provided for the execution of a formal contract, but the parties were unable to agree on the form proposed, which complainant insisted should contain a clause for a common user bridge,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

whereupon negotiations ceased for a time, during which the railroad company treated with the city in regard to such bridge, and afterwards notified complainant that it was ready to consummate the transaction and accept deeds to the property, the railroad company's conduct did not constitute a waiver of its right to a formal agreement in accordance with the offer and acceptance.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 68; Dec. Dig. § 42.*]

**7. FRAUDS, STATUTE OF (§ 129\*)—PART PERFORMANCE.**

Where an acceptance of a proposal to sell land for railroad purposes provided that a formal agreement should be entered into in accordance with the offer and acceptance, and that complainant vendor should remove the buildings from the property within six months from the date of the deeds, but no formal contract was ever agreed on, and complainant refused to deliver the deeds on demand, the mere removal of the buildings, not shown to have been done solely in part performance of the contract, was not such a part performance as would take the case out of the statute of frauds.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 287–292, 303, 306–308, 311, 314, 318–320, 322, 325, 326; Dec. Dig. § 129.*]

Suit by the Northwestern Lumber Company against the Grays Harbor & Puget Sound Railway Company and others. Bill dismissed.

Grosscup & Morrow, of Tacoma, Wash., for complainant.
Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for defendants.

CUSHMAN, District Judge. Complainant relies upon the following authorities: Windsor v. St. Paul, etc., Ry. Co., 37 Wash. 156, 79 Pac. 613, 3 Ann. Cas. 62; No. American Trans. Co. v. Samuels, 146 Fed. 51, 76 C. C. A. 506; Bradley v. Steam Packet Co., 13 Pet. 89, 10 L. Ed. 72; Sultan Log. Co. v. Great Northern, 58 Wash. 604, 109 Pac. 320, 1020; Anderson v. Lumber Co., 30 Wash. 147, 70 Pac. 247; Moses v. Bank, 149 U. S. 298, 13 Sup. Ct. 900, 37 L. Ed. 743; Brashear v. West, 7 Pet. 609, 8 L. Ed. 801; McLean v. Sellers, 44 Mont. 389, 120 Pac. 242; Marden v. Leimbach, 115 Md. 206, 80 Atl. 958; Johnson v. Tribby, 27 App. D. C. 281; Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501; Morgan v. Bell, 3 Wash. 554, 28 Pac. 925, 16 L. R. A. 614; Pomeroy's Equity Jurisprudence, § 842; Frye on Specific Performance, § 258; Storer v. Great Western Ry., 2 Young & Collier Chancery Reports, 48; Pembroke v. Thorpe, 3 Swanston's Ch. Rep. 482; Hawkes v. Eastern Counties Ry., 22 Chancellor's Reports, 739; Cathcart v. Robinson, 5 Pet. 277, 8 L. Ed. 120; Kentucky Distilleries, etc., Co. v. Blanton, 149 Fed. 40, 80 C. C. A. 343; Tayloe v. Insurance Co., 9 How. 390–405, 13 L. Ed. 187; Eames v. Insurance Co., 94 U. S. 621, 24 L. Ed. 298.

Defendants rely upon the following authorities: Swash v. Sharpstein, 14 Wash. 426, 44 Pac. 862, 32 L. R. A. 796; Hite & Raffeto v. Savannah Elec. Co., 164 Fed. 944, 90 C. C. A. 348; Crossley v. Maycock, 18 Eq. Cas. 180; Clark v. Davidson, 53 Wis. 317, 10 N. W. 384; Ellis v. Cary, 74 Wis. 176, 42 N. W. 252, 4 L. R. A. 55, 17 Am. St. Rep. 125; Brown on St. Frauds, § 376; Sorensen v. Keyser, 51 Fed. 30, 2 C. C. A. 92; Bailey v. Railroad Co., 17 Wall. 96, 21 L. Ed.

611; Blake v. Co., 76 Fed. 624, 22 C. C. A. 430; De Witt v. Berry, 134 U. S. 306, 10 Sup. Ct. 536, 33 L. Ed. 896; Johnson v. Lara, 50 Wash. 368, 97 Pac. 231; Allen v. Treat, 48 Wash. 552, 94 Pac. 102; Hogan v. Kyle, 7 Wash. 600, 35 Pac. 399, 38 Am. St. Rep. 910; Peters v. Van Horn, 37 Wash. 550, 79 Pac. 1110; Morgan v. Bell, 3 Wash. 554, 565, 28 Pac. 925, 16 L. R. A. 614: 3 Pom. Eq. Jur. § 1410; McKinney v. Big H. & C. Co., 167 Fed. 770, 93 C. C. A. 258.

This cause is for decision upon the bill, answer, reply, and evidence thereunder. The bill is one for specific performance. Complainant is, and was, the owner of a large amount of real estate in the town of Hoquiam, and otherwise interested in certain business enterprises at that place.

The defendant Grays Harbor & Puget Sound Railway Company was, in 1908, seeking to obtain an entrance for its road to Hoquiam, and to acquire depot and terminal grounds, right of way, and franchises therein. The other defendants have succeeded to or acquired interests from the Grays Harbor & Puget Sound Railway Company, the nature of whose rights and liabilities among themselves it is not necessary to state. They will be mentioned herein as "defendants."

Through the chief engineer of said railroad company, it entered into negotiations with complainant, which resulted in complainant, in September, 1908, submitting three separate propositions to the defendant railroad company, through the latter's engineer. The second and third propositions were:

" 'Simpson Avenue Line,' with Depot Grounds in Block 50. Across Northwestern Lumber Company's log pocket on the extension of Simpson avenue, which is across lot 1 of tract 15, plat 9, Hoquiam Tide & Shore Lands: thence across or along Levee street, adjacent to blocks 70, 62, 61, eighty-eight feet in block 51 and two hundred and fifty feet, eleven inches, in block 50, together with the return right of way through blocks 62, 70 and 69, joining Northern Pacific right of way through those blocks and through lot 3, tract 15, plat 9, to Railroad avenue along Twelfth street vacated and adjoining Northern Pacific Track, to K street. This right of way to be adequate for double trackage except on its return or switch track through blocks 70, 69 and Twelfth street. Also to include for depot grounds the east 182 feet of block 50, all for the sum of $102,000.00, one hundred two thousand dollars."

" 'Emerson's Proposition.' The same as Simpson Avenue Line omitting depot grounds in block 50 and adding the east half of blocks 62 & 61 and eighty-eight feet on Levee street by 100 feet in block 51, you to join with the Northwestern Lumber Company dedicating 50-foot street along the center line of blocks 61 & 62, for the sum of one hundred thirty-four thousand dollars ($134,000.00)."

In June, 1909, this offer was conditionally accepted by a letter from the railroad company's engineer to complainant, stating:

"We beg to advise you that we accept what is called the 'Emerson' proposition, contained in your letter to Mr. H. F. Baldwin dated September 25th, 1908, being your proposition for one hundred and thirty-four ($134,000) dollars. We will present you a map showing in detail such proposition and a formal agreement shall be entered into, pending actual transfers. However, we will expect and you shall give us your co-operation in procuring other properties in Hoquiam and also franchises in Hoquiam. You shall without delay furnish our attorneys with abstracts of title and our attorneys shall have twenty (20) days after delivery of abstracts within which to examine same, and upon our attorneys passing title, and delivery by you to us of prop-

er deeds of warranty to such property, we will pay you the aforesaid sum. All buildings to be removed by you within six months from date of deed."

This, in turn, was accepted by the complainant. Thereafter a map was presented to complainant by the defendant's engineer. This map showed the location of a railroad bridge across the river in Hoquiam. Abstracts were, without delay, furnished the attorney of the defendant railroad company. These abstracts disclosed good title to the property, save in certain particulars, not material.

In June, 1909, the engineer of the defendant railroad company, who had conducted the negotiations, died, being succeeded, July 1, 1909, by Mr. J. R. Holman. There were conferences between the representatives of the parties upon the terms and details of the formal contract, mentioned in the defendant's acceptance.

The attorney for the railroad company and George H. Emerson, vice president of complainant, at length so far agreed upon a form of contract as to dictate a draft to complainant's stenographer, which was submitted to the president of the complainant company. It contained the following provision:

"7. It is agreed by the said first party and their officers, that they will cooperate with the said second party in procuring such franchises of the city of Hoquiam as it may desire and in procuring such additional rights of way in the city of Hoquiam as the second party may desire."

The president of complainant refused to execute the contract until another paragraph was inserted, providing:

"8. It is stipulated by the first party that the construction of the approach to the proposed bridge on the extension of Simpson Ave. shall be so arranged as to interfere with the handling of logs in their mill pond the least possible, and with that object in view that an ample span shall be placed west of the west pier of the drawbridge, and that the bridge abutment be placed as nearly as possible, consistent with the economical spacing of the spans of said bridge, and in accordance with the requirements of the U. S. government, about thirty ft. into the river from the line of the piles of the first party's pond as such piles are now driven. It is also further stipulated by the first party that such bridge may be a joint user bridge with the city of Hoquiam provided the city of Hoquiam contributes its share of cost of construction and maintenance."

The following provision was also inserted:

"1. The said party of the first part for the consideration of $134,000.00, to be paid by second party, *Twenty thousand dollars of which is paid down by second party, the receipt* whereof is hereby acknowledged, and the covenants and agreements hereinafter mentioned.  *  *  *"

The contract, as then prepared, was, on July 7, 1909, forwarded to the railroad company at Seattle by complainant; but was returned, unexecuted, July 21st to the attorney of the railroad company in Hoquiam, by Mr. Holman, who had, on July 1st, succeeded to the position of engineer for the railroad company, after the decease of Mr. Baldwin. This attorney, July 23d, advised complainant that the railroad company would not execute the contract on account of its containing, in paragraph 8, the "common user" bridge clause.

Conferences were had between the officers of complainant and the attorney of the railroad company, trying to reach an agreement con-

cerning the objectionable provision; but without being able to do so. Thereafter, on September 15th, complainant demanded that the attorney for the railroad company return this formal contract to it, which he did on the same day, with the following letter:

"Per your request of this date I herewith hand you a proposed agreement between yourself as the party of the first part and Grays Harbor & Puget Sound Railway Company as the party of the second part, the same being with reference to the purchase of certain properties from you. Such agreement being dated July 7, 1909, and having been executed by you, but not by the railway company. I consider that since this agreement has not been executed by the railway company yet you are entitled to have it returned to you, but by so returning to you it is not the intention of the railway company to waive any rights which it has with reference to the agreement to purchase this property and I anticipate that it is not your intention that the handling of these papers to you should have that effect."

The attorney testifies that the immediate surrender of the prepared draft being required, and having no time to confer with his company, he wrote this letter. Complainant made no answer to it, and negotiations were suspended.

The railroad company thereafter negotiated with the city authorities and with a so-called "Citizens' Committee" concerning the contemplated bridge. Officers of the complainant were present at certain of these negotiations, and its manager was accused, by defendants, of opposing the railroad company in this matter.

In June, 1910, the Grays Harbor & Puget Sound Railway Company sold all of its property to the Oregon & Washington Railway Company. At length, the railroad company, on September 9, 1910, reached an agreement with the "Citizens' Committee" concerning the bridge, by which it was provided that it should not be a "common user" bridge.

After this matter was so arranged, the engineer of the defendant railroad, on the same day, notified the complainant that it was ready to take up the deeds to the property desired. Upon this request, Mr Jones, the president of complainant, met with the engineer and attorney for the defendant railroad. There is a conflict in the testimony of these men as to exactly what took place at this interview. The attorney and engineer for the railroad company testify that Mr. Jones demanded $144,000 for the property, being $10,000 more than the price made in the accepted proposition, which the engineer refused, and that Mr. Jones informed them that it could not be had for less. Mr. Jones testifies that he represented to the engineer that the complainant should receive interest on the $134,000, the original price, for the length of time that had elapsed since the acceptance. Interest on $134,000, at 6 per cent., from June 9, 1909, to September 9, 1910, would slightly exceed $10,000.

It is probable that Mr. Jones demanded $144,000, and he probably called attention to the fact that interest during the delay would amount to as much as the extra amount demanded. Not only do the attorney and engineer testify that Mr. Jones made a positive demand for the amount in excess of the agreed price, but Mr. Emerson, complainant's vice president, testifies that he understood Mr. Jones had made a

demand for interest. The complainant has been, at all times, in possession of the property.

[1] Complainant now contends that this was not a breaking off of negotiations, nor a refusal on its part to perform, but simply a request of its president that, before carrying out the contract, Mr. Holman submit to his superiors the claim of complainant that it be allowed interest on the purchase price. It cannot be so held. If such was the understanding of those present, or of Mr. Jones, the complainant's president, the matter would, in all probability, soon have been broached again; but this was not done.

In December, 1910, the Oregon & Washington Railway Company sold its property to the Oregon-Washington Railroad & Navigation Company. Defendant's engineer continued to treat with the city authorities, and, at length, the railroad company entered into a traffic arrangement with the Northern Pacific, thereby obtaining an entrance into Hoquiam, and its trains came in over the tracks of that company, upon learning which, complainant tendered deeds to the property to the defendant railroad company, reciting a consideration of $134,000, and demanded performance of defendant; and, upon refusal, instituted this suit to compel defendants to specifically perform the foregoing agreement.

A "common user" bridge would have been a benefit to complainant and its other property. Much had, doubtless, been said in the negotiations concerning this bridge; but the evidence does not disclose an agreement. No mention is made of it in either of the letters containing the proposition and acceptance. And when, by the provision contained in paragraph 8 of the formal contract, the complainant sought to bind the railroad company to a partnership with the city in a "common user" bridge, it was requiring the making of a new contract, and whether this be viewed as showing that the minds of the parties had not really met, though, prima facie, it appeared by the original offer and acceptance that they had met, or as a refusal by complainant to perform—the refusal being put in the shape of a demand not contemplated—is all one, for the effect is the same.

"If we assume that the offer and acceptance is, prima facie, evidence of a contract, it is, of course, the contract embraced by the written offer and no other. What is to be inferred by the preparation and presentation by Nash of the formal writing differing in terms from the offer accepted? If he was acting in good faith, the writing prepared by him must be his interpretation and construction of the offer to sell which had been accepted, and if that be true, with the written offer before us, we would be forced to conclude that there was nothing to show that the sellers had made the agreement as construed by Nash. This would lead to the conclusion that the minds of the contracting parties had not met, and that, although the offer and its acceptance was apparently a completed contract, the subsequent occurrences showed that, in fact, there had not been an agreement. But if the offer and its acceptance did, as matter of law, make a contract, it should not be held, and we do not hold, that the subsequent action of the buyer rescinded or canceled it. This plainly could not be done against the wishes of the sellers. Such action could not do more than extend to the sellers the opportunity to withdraw their offer.

"If, on the other hand, we infer that the offer was so plain that Nash must have understood its terms, and that the formal writing prepared by him does

not present his construction of the offer, but that it is a counter proposition made by him, or an effort to obtain better terms than those embraced in the offer, what then should follow? If the offer and its acceptance was not binding on the buyer, it was not binding on the sellers; for it is axiomatic that, unless both are bound, neither will be bound. Bishop on Contracts, § 78. If the buyer was free to propose new terms, the sellers were free to decline them. In suggesting new terms, the buyer, in effect, said that the offer and acceptance was not final. If not final as to the buyer, it could not be conclusive as to the sellers, and they were free to withdraw from the negotiations. Bristol, etc., Co. v. Maggs, 44 Ch. Div. L. R. 618; Johnson v. Latimer, 71 Ga. 470. See, also, Bellamy v. Debenham, 45 Ch. Div. L. R. 481; s. c., on appeal, 1 Ch. Div. (1891) L. R. 412. The buyer should not be permitted to treat the negotiations as open for the purpose of seeking better terms, and, at the same time, hold them closed so as to bind the sellers if they fail to accept the proposed changes. When it proposes a contract materially variant from the offer, it takes the position that the acceptance of the offer was not unconditional and conclusive. The contract for the breach of which this suit is brought is the offer to sell and the acceptance of the offer. If they stood alone, as we have said, they would contain apparently all the elements of a contract. It seems to us that we cannot be required to stop at the acceptance and refuse to consider what followed. Nash immediately proceeded to prepare the formal writing. It was ready for signing on the next day. If it could have been finished instantly when the offer was accepted, and if Nash could have handed the sellers his draft of the formal contract at the moment of acceptance, the acts all taken together would have meant an acceptance of the offer, with the understanding that it be construed to mean what Nash proposed in the new writing. Clearly the first offer would not bind the buyer until it was unconditionally accepted, and the new writing would not bind the sellers, it containing new terms, until they agreed to it. Crossley v. Maycock, 18 Eq. Cas. 180." Hite & Rafetto v. Savannah Elec. Co., 164 Fed. 944, at pages 951, 952, 90 C. C. A. 348, at pages 355, 356.

It was argued, on behalf of complainant, that the eighth paragraph was no departure from, or variation of, the original contract; that it was only putting in form what the parties had agreed concerning one of those franchises to be asked from the city. It may have been complainant's understanding; but it is not shown that the railroad company so agreed, or understood. It is urged that the evidence as to those negotiations does not tend to vary the terms of the written contract, but only to disclose the subject-matter referred to as "franchises in Hoquiam," mentioned in the railroad company's acceptance of complainant's proposition.

[2] If it were conceded that "franchises in Hoquiam" might be shown to contemplate franchises in particular places in Hoquiam, and not such franchises as the railroad company then or thereafter concluded that it desired, yet it would be an abuse of the exception to the rule to go further and hold that the particular form of franchise in contemplation was to be limited and burdened in the manner sought by the last clause of paragraph eight, and parol evidence to substantiate such claim would constitute an unwarranted variation of the contract.

A formal contract was contemplated when the letter of acceptance was written. If the formal contract had been made, the preliminary arrangement made by letter would be functus officio—either the letters would, of necessity, have formed the contract, or the formal instrument would have done so. The letters disclose certain main con-

siderations for the contract, but much of detail in them was left unexpressed, as is disclosed by the provisions in the formal draft, concerning which there is no dispute.

These specifications, in the letters, would hold the parties to the main provisions of the proposition, where they could not break them, or, if they did, it would be clear who was wrong. If, when they came to enter into a formal agreement, one side or the other refused to subscribe to one of these main propositions, the right of the matter could be easily determined. But when, in the preparation of the formal agreement, the parties find, although honestly striving, that they cannot agree on some matter unexpressed in the original agreement made by the letters, then the court must conclude that their minds have not met. The formal agreement then becomes a prerequisite to the consummated contract. A breach cannot be determined because the parties, themselves, by providing, specially, for a formal agreement, have provided against the very thing that happened. If, when the letters were written, they considered it necessary to provide against this contingency, by requiring a formal contract, the court cannot undertake to interpret the unconsummated agreement and make a contract for them.

[3] It is further urged that the contract is not varied by paragraph eight; that it was a requirement called forth by the language of paragraph 7, the latter having been inserted at the dictation of the attorney for the railroad company; that paragraph 7 is broader than the provisions contained in the original acceptance, which acceptance read, "franchises in Hoquiam," while paragraph 7 reads, "such franchises of the city of Hoquiam as it may desire and in procuring such additional rights of way in the city of Hoquiam as the second party may desire."

Paragraph 7 is not a substantial broadening or variation of the language contained in the acceptance. The situation of the parties and the magnitude of the enterprise undertaken by the defendant render it unlikely that each and all of the franchises necessary to its undertaking had been determined upon by the engineer. It is more reasonable to think that the provision in the acceptance contemplated, not only franchises then deemed necessary by the defendant railroad company, but those which, in the progress of its undertaking, would be found necessary and desirable.

Literally, "franchises in Hoquiam" is broader and more comprehensive than "such franchises in Hoquiam as we may desire"; for the former would include those desired and those not. The letter of acceptance did not fairly contemplate any limitation other than that the franchises should be in Hoquiam. The addition limited, rather than broadened, the original language. The map mentioned in the acceptance and furnished complainant shows that a bridge was contemplated at the point in question. Therefore the issue between the parties was whether the franchise for this bridge should be such as complainant desired, or as defendant desired. The latter is the more likely.

Parol testimony will be admitted to disclose the situation of the parties to a contract, but this is as far as the statute of frauds may be relaxed in allowing evidence to make plain the contract.

While, doubtless, the more important franchise requirements had been determined upon, yet, at the stage at which the project then was, naturally, all franchises to be asked of the city could not be foreseen, and, whether in fact they had been foreseen or not, an engineer of ordinary prudence would hesitate to act on the assumption that he had foreseen everything. It is therefore reasonable to conclude that the language used in the acceptance must have been used in at least as broad a sense as that expressed in paragraph 7.

It is further concluded, as a matter of fact, that the objectionable clause in paragraph 8 was insisted upon by complainant, as pointed out above, rather for its own advantage and protection—in a matter deemed necessary by it—than on account of the language of paragraph 7. The complainant could have protected itself against paragraph 7 by stipulating that it be not required to co-operate with defendant for other than a "common user" bridge, without stipulating that the bridge be a "common user" bridge, thus binding defendant to accept a "common user" bridge.

[4] It is argued that no demand was made upon the complainant to execute a contract from which paragraph 8 was omitted. As pointed out, one was prepared and submitted to complainant in which this objectionable paragraph was omitted. At the dictation of complainant's president, it was redrafted to include paragraph 8 and was, in that form, executed by him for complainant. The vice president of the complainant testifies that Mr. Jones, its president, only signed the contract containing the "common user" bridge clause; his testimony being as follows:

"Q. Is it not a fact that the only agreement Mr. Jones was willing to sign was the one containing the bridge clause? A. The only one he was willing to sign was the one he did sign, and it contained a bridge clause."

This sufficiently shows a refusal by complainant to execute a contract that did not include paragraph 8.

[5] It is argued that the formal agreement called for in the acceptance is waived both by the letter of the attorney of the railroad, returning, unexecuted, the prepared draft, and the conduct of the parties. So far as this letter is concerned, if it were conceded that the attorney had the authority to change the contract, he did not waive any right on account of a breach of the contract. If the prepared contract had simply been returned without comment or demand, no rights would have been waived. The attorney's letter no more than called the attention of complainant to the fact that no acknowledgment was made by the return of the demanded instrument of a changed situation, or the loss of any right on account of a breach, or otherwise, that the railroad had not surrendered any rights by the surrender of this paper.

[6] In so far as the contention that the conduct of the parties constituted a waiver of the formal agreement is concerned, the evidence warrants no other conclusion than that, when they found that an agreement could not be reached on account of the "common user" bridge clause, insisted upon by complainant, matters were left in

abeyance; as each party desired the consummation of the entire transaction, while the railroad treated with the city in regard to the bridge, it being the plan of each to resume negotiations when the bridge question was settled.

Such conduct does not constitute a waiver of the formal contract. It might constitute a waiver of the time contemplated within which it was to be entered into. It is no more than saying: "We cannot agree now. We will wait and see if we cannot agree later."

[7] Nothing was done towards acceptance or performance by either party. It is argued that the removal of certain buildings from the land by complainant was such part performance as to take the contract out of the statute of frauds. These buildings were not moved at the request of the railroad company. The acceptance provided that the buildings upon the land should be removed within six months from the date of the deeds.

The mere removal of buildings would not constitute such part performance of this contract as to take it out of the statute of frauds, because, in the nature of things, it could not be made to appear that it was solely done as performance and not for other reasons. Further, the evidence is not sufficient to warrant a finding that the defendant knew that they were being removed in performance.

Complainant contends that it was warranted in removing the buildings upon the assumption that the defendant would take the land, because it was known that the defendant railroad was continuing its negotiations with the city of Hoquiam for its contemplated franchise. Complainant may have been influenced by this fact in the course pursued by it; but that fact does not give it any legal or equitable right against the defendant company. There was no privity between it and the city in this matter. The removal of the buildings would not be a sufficient part performance, in any event, to take the contract out of the statute of frauds.

"By the weight of authority at this time the rule seems to be settled that, in order to enforce specific performance of a parol contract to convey land, possession must have been transferred. The Supreme Court of the United States, in Purcell v. Miner, 4 Wall. 513 [18 L. Ed. 435], decided in 1866, strongly support this doctrine. Pond v. Sheehan [23 N. E. 1018], decided by the Supreme Court of Illinois in 1890, holds that delivery is essential. Many other cases are cited in the opinion there rendered. Johns v. Johns, 67 Ind. 440, holds likewise, and the Supreme Court of Pennsylvania, in the case of Pugh v. Good, 3 Watts & S. 56, 37 Am. Dec. 534, holds that delivery of possession pursuant to the contract is the test of part performance. We shall not call attention to all of the cases so holding, but there is another line which, while not directly passing upon this question, holds that a part performance by one of the parties is not sufficient, and that there must have been a part performance by the other party also. Some of them are Wallace v. Long, 105 Ind. 522, 5 N. E. 666, 55 Am. Rep. 222; Austin v. Davis, 128 Ind. 472, 26 N. E. 890, 12 L. R. A. 520, 25 Am. St. Rep. 456; and Ellis v. Cary, supra, 74 Wis. 176, 42 N. W. 252, 4 L. R. A. 55, 17 Am. St. Rep. 125." Swash v. Sharpstein, 14 Wash. 426, at page 436, 44 Pac. 862, 32 L. R. A. 796.

Whether a formal agreement was waived by the defendant, either by its conduct at the time of the halting of negotiations, on account of a disagreement over the "common user" bridge clause, or upon the

engineer's informing complainant's president that he was ready to take up the deeds, in September, 1910, is not important, as it is clear that the complainant, through its president, refused to perform its part of the contract and demanded $10,000 additional compensation to that agreed upon. The complainant's demand and refusal excused the defendant from making any further offer, as a useless formality, and it makes no difference whether the offer of $134,000 by defendant's engineer be considered as an assertion by him that the contract was still in force, or as an offer to pay the price before offered.

The complainant having refused to perform what it now claims was the contract, and the defendant having acquired other property for the purposes desired, it is now excused from performance, and a rescission of the contract should be decreed.

For the reasons above stated, complainant was not entitled to anything in the nature of interest for the time of the delay. If complainant considered that it was entitled to interest, it could have protected itself by tendering the deeds, without waiving its claim to interest; but, when it made a demand for $10,000, additional, before the surrender of its deeds, it made a demand for such substantial additional compensation as to require a new contract to warrant it.

Having reached this conclusion, it is not necessary to consider the question of complainant's laches, based on its quiescence, after the refusal of complainant to transfer the property for $134,000 and defendant's refusal to pay $144,000, during which delay the defendant had acquired other rights and property, giving it the desired entry into Hoquiam.

The bill is dismissed.